## IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| v. | : | CRIMINAL NO. 23-96 |
| YANTHONIC HERRERA | : | |

### GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTIONS TO DISMISS THE INDICTMENT, SUPPRESS PHYSICAL EVIDENCE OBTAINED VIA SEARCH WARRANT AND REVEAL THE CONFIDENTIAL INFORMANT'S IDENTITY

The United States of America, by and through its attorneys, Jacqueline C. Romero, United States Attorney for the Eastern District of Pennsylvania, and Jason D. Grenell, Assistant United States Attorney, files this response to defendant Herrera's motions to dismiss the indictment, to suppress physical evidence obtained from his apartment at 7131 Beech Tree Drive, Elkins Park, and to reveal the identity of the confidential informants. (ECFs 99, 101, and 102).

### I.    PROCEDURAL BACKGROUND

On July 29, 2019, the Honorable Thomas J. Rueter issued a complaint and warrant for defendant Yanthonic Herrera charging him with possession with the intent to distribute and aiding and abetting possession with the intent to distribute 1 kilogram or more of heroin and 400 grams or more of fentanyl in violation of Title 21 United States Code Section 841(a)(1)(A) and Title 18 United States Code Section 2. On July 20, 2022, defendant Herrera was arrested, pursuant to the arrest warrant, on July 19, 2022. After his arrest, the time in which the government was obligated to file an indictment or information was extended several times. On March 8, 2023, the defendant was indicted by a grand jury sitting in the Eastern District of

Pennsylvania and charged with possession with intent to distribute and aiding and abetting possession with the intent to distribute 1 kilogram or more of heroin and 400 grams or more of fentanyl in violation of Title 21 United States Code Section 841(a)(1)(A) and Title 18 United States Code Section 2. On April 27, 2023, the defendant filed a motion to suppress, ECF 39, claiming that his constitutional rights were violated when law enforcement searched his apartment at 7131 Brookview Apartments, Elkins Park, Montgomery County, Pennsylvania. On September 18, 2023, the motion was denied by this Court. ECF 60 and 61. The defendant has now fired previous counsel and filed three more motions. These motions have no basis in fact or law and should be denied.

## II.    FACTS SURROUNDING THE DEFENDANT'S RETURN TO THE UNITED STATES

In July 2019, HERRERA along with JUNIOR SORIANO FELIX and MAXWELL GOMEZ (HERRERA's brother) became suspects in a kidnapping investigation leading the local authorities to obtain arrest warrants for the three alleged co-conspirators. On the morning of July 23, 2019, the FBI Safe Streets Task Force established surveillance of 1808 Afton Street, 7131 Beech Tree Drive and 5945 North Lawrence Street (the residence of the HERRERA's brother's mother) in an attempt to locate and arrest HERRERA and his cohorts on the open kidnapping warrant.

Just before noon, Officer Cullen saw HERRERA exit the Brookview Apartments apartment building and enter his Buick Enclave. Cullen then saw Herrera driving his Buick Enclave in the parking lot of Brookview Apartments. Officer Cullen briefly lost sight of HERRERA as he drove through the parking lot. When the officer next saw HERRERA, HERRERA was backing his Buick out of a parking spot and beginning to pull away. As the

officer was alone, the officer, for officer safety reasons, did not attempt to arrest HERRERA. HERRERA departed the complex and officers were not able to locate HERRERA.

At approximately 5:00 p.m., HERRERA was observed arriving at 5945 Lawrence Street driving the Buick Enclave. HERRERA parked on the sidewalk in an area difficult for investigators to view. After a short time, investigators established a better view of the Buick and determined it was unoccupied. Although HERRERA was observed entering 5945 Lawrence Street, investigators-maintained surveillance of the residence.

Just before 6:00 p.m., HERRERA was observed exiting the 5945 Lawrence Street residence and departing the area in the Buick. Investigators began to follow HERRERA as they waited for the assistance of a marked Philadelphia Police car. Prior to the arrival of the marked police car, HERRERA began to drive evasively. Investigators attempted to stop HERRERA, but he continued driving and failed to yield. HERRERA then increased his speed and led investigators on a pursuit through the streets of Philadelphia. Members of the FBI tried to block HERRERA's path with a vehicle, but HERRERA collided with the FBI vehicle and continued fleeing. HERRERA eventually left the roadway and began driving across the grass and through Fisher Park. As soon as HERRERA's vehicle reached the tree line, HERRERA bailed out of the vehicle and ran into the woods, where he managed to evade capture. Investigators later learned that HERRERA subsequently fled to the Dominican Republic.

On July 18, 2022, Dominican Authorities working with the United States Marshals in the Dominican Republic arrested Yanthonic HERRERA. They did this of their own volition and were not directed by the United States Attorney's Office or the FBI. The Dominican authorities and the Marshals located Herrera in the town of Cotui, Dominican Republic on July 18, 2022, in a house (Calle Hosto, Sector Hato, Cotui) where the defendant was presumably living for some

time. The defendant was heavily armed and accompanied by at least two other males at the time

of his arrest. The Dominican authorities and representatives of the Marshals reported that their

team executed the arrest without incident. The defendant was expelled from the Dominican

authorities and returned to the United States by flying to Newark Liberty Airport escorted by two

Dominican officers the day after his arrest on July 19, 2022. Prior to leaving the country, the

Dominican authorities crafted a document in which they stated that the defendant was a citizen

of the United States. This is not accurate. The defendant is a citizen of the Dominican Republic.

Immigration authorities issued ICE detainers for his arrest. The defendant was arrested federally

based on his outstanding warrant.

### III.    MOTION TO DISMISS BASED ON THE DEFENDANT'S REMOVAL TO THE UNITED STATES

#### a.    This Court's Jurisdiction Over The Defendant And Relevant Legal Standard

It is well established that a court's power to try a defendant is ordinarily not affected by

the manner in which the defendant is brought to trial. *See Frisbie v. Collins*, 342 U.S. 519, 522

(1952) (upholding conviction of defendant who had been kidnapped in Chicago by Michigan

officers and brought to trial in Michigan); *Ker v. Illinois*, 119 U.S. 436, 444, (1886) (holding that

court's power to try defendant for crime was not impaired by forcible abduction of defendant

from Peru); *United States v. Alvarez-Macahin*, 504 U.S. 655, 670 (1992) (defendant's forcible

abduction does not prohibit his trial in a court in the United States for violations of the criminal

laws of the United States); s*ee also United States v. Romero–Galue*, 757 F.2d 1147, 1151 n.10

(11th Cir.1985) (noting that "[j]urisdiction over the person of a defendant 'in a federal criminal

trial whether citizen or alien, whether arrested within or beyond the territory of the United

States,' is not subject to challenge on the ground that the defendant's presence before the court

was unlawfully secured") (quoting *United States v. Winter*, 509 F.2d 975, 985–86 (5th Cir.1975)). This general rule, commonly referred to as the *Ker–Frisbie* doctrine, "rest[s] on the sound basis that due process of law is satisfied when one present in court is convicted of a crime after having been fairly apprised of the charges against him and after a fair trial in accordance with constitutional procedural safeguards." *Frisbie*, 342 U.S. at 522.

### b.    <u>Argument As To The Defendant's "Abduction"</u>

The defendant - through a signed affidavit - alleges that he was forcibly abducted and brought to the United States against his will. The defendant alleges that he was beaten, thrown in the trunk of a car, extorted and not given food or water for an entire day. Even if true, which the government does not concede, the defendant's entire motion to dismiss is premised on an out of circuit case[1] that, if not outright abrogated, rests on shaky legal ground and is not recognized in the Third Circuit or by the Supreme Court of the United States.

### i.    **The defendant's claims are uncorroborated and false.**

As a preliminary issue, no one from the FBI or the United States Attorney's office asked for Herrera to be removed to the United States, especially in the way it was done. After Herrera was removed to the United States, the FBI contacted the United States Marshals in the Dominican Republic. A representative of the Marshals told agents that Herrera was located in the town of Cotui, Dominican Republic on July 18, 2022, in a house (Calle Hosto, Sector Hato, Cotui) where he was presumably living for some time. He was heavily armed and accompanied by at least two other males at the time of arrest. It was reported to the FBI that the local team was able to execute the arrest without incident.[2]  Lending credibility to this narrative, over the

---

[1] *United States v. Toscanino*, 500 F.2d 267 (2d Cir.1974)
[2] This information comes from an email dated August 17, 2022.

defendant's, are the documents and photographs provided by the Dominican authorities. In the defendant's sworn affidavit, he says that he was severely beaten, and pistol whipped so hard that he lost a tooth. Below is a picture of the defendant from the day of his arrest. He does not appear to have any physical injuries.



Additionally, the defendant fails to mention that the time he was arrested he was in possession of a firearm, pictured below:



DIRECCION ESPECIAL DE BUSQUEDA DE REBELDES Y PROFUGOS, D.N.C.D.

At the time of the defendant's arrest, the defendant was wanted pursuant to a complaint and warrant charging him with possession with intent to distribute and aiding and abetting possession with the intent to distribute 1 kilogram or more of heroin and 400 grams or more of fentanyl in violation of Title 21 United States Code Section 841(a)(1)(A) and Title 18 United States Code Section 2. No extradition paperwork had been filed at the time of the defendant's arrest in the Dominican Republic. The FBI was using a confidential informant to discover where the defendant was but took no action to alert Dominican authorities to his location. Neither the FBI nor any official of the United States informed the Dominican authorities where the defendant was or asked the Dominican authorities to seize the defendant. The defendant, however, was seized pursuant to a valid arrest warrant. It appears that the Marshals in the Dominican Republic in coordination with Dominican authorities arrested the defendant and brought him to the United States. No one was directed to harm, assault, or steal from the

defendant. It is also highly doubtful that any of this conduct occurred. The Dominicans photographed the defendant's vehicles, weapons and person upon his arrest.

The defendant relies on *United States v. Toscanino*, 500 F.2d 267 (2d Cir.1974), which dealt with conduct that "shock[ed] the conscience," at the behest of the United States. No such conduct occurred here. Even taking the defendant's position as true[3], the Dominican authorities were not acting at the behest of the United States. Thus, even under the shaky reasoning of *Toscanino*, there is no due process violation. *Id*. at 275 (the court must divest itself of jurisdiction over the person of a defendant where it has been acquired as the result of the *government's* deliberate, unnecessary and unreasonable invasion of the accused's constitutional rights.") (emphasis added).

### ii.    Even if the United States was involved in the defendant's abduction[4], there is no violation of due process.

The defendant's entire argument rests on *United States v. Toscanino*, 500 F.2d 267 (2d Cir.1974), which is not precedential or even persuasive in this Circuit. The defendant in *Toscanino* alleged that he had been forcibly abducted from Uruguay and tortured and interrogated over seventeen days *at the behest of the United States government*. *Id*. at 269–70 (emphasis added). Concluding that the government's alleged conduct "shocks the conscience," *Id*. at 273, the Second Circuit held that the *Ker–Frisbie* doctrine must yield to the requirements of due process and, accordingly, that a court must "divest itself of jurisdiction over the person of

---

[3] The government does not assign any truth to the defendant's account. His affidavit is hearsay and should not be accepted by this Court without the defendant testifying and being subject to cross examination.

[4] Again, the United States did not direct the Dominican authorities to take any action to harm the defendant. Nor does the United States condone any of the actions described by the defendant, if they occurred at all.

a defendant where it has been acquired as the result of the government's deliberate, unnecessary and unreasonable invasion of the accused's constitutional rights." *Id*. at 275. Shortly after the case was decided, however, the Second Circuit limited *Toscanino*'s breadth. *See United States ex rel. Lujan v. Gengler*, 510 F.2d 62 (2d Cir.1975) (no due process violation where Bolivian police acting as paid agents of the United States abducted the defendant and removed him to the United States). The Supreme Court's case law post *Toscanino* has made clear that *Toscanino* is not good law even limited to its outrageous facts. *Gerstein v. Pugh*, 420 U.S. 103, 119 (1975), a post *Toscanino* Supreme Court case, reaffirmed the *Ker-Frisbie* doctrine and restated that, "illegal arrest or detention does not void a subsequent conviction." In *United States v. Alvarez–Machain*, 504 U.S. 655 (1992), the Court held that the rule of *Ker–Frisbie* was fully applicable to a case in which a Mexican national was forcibly abducted, even though the abduction may have been "shocking" and in violation of general international law principles. *Id*. at 669–70.

The Third Circuit recognized this procedural history in *United States v. Best*, 304 F.3d 308, 313 (3d Cir. 2002). In *Best*, the United States Coast Guard illegally seized the defendant while he was in a Brazilian boat in international waters. The Third Circuit stated that, "it appears clear that the Ker–Frisbie doctrine has not eroded, and that the exception described in *Toscanino* rests on shaky ground." *Id.* at 313 *citing United States v. Matta–Ballesteros*, 71 F.3d 754, 763 (9th Cir.1995) (observing that, "[i]n the shadow cast by *Alvarez–Machain*, attempts to expand due process rights into the realm of foreign abductions, as the Second Circuit did in [Toscanino], have been cut short")[5]. The Court eventually declined to adopt the standard laid out in *Toscanino*

---

[5] Additionally, the extradition treaty between the Dominican Republic does not contain any language expressly prohibiting forcible abduction. *United States v. Alvarez–Machain*, 504 U.S. 655 (1992) primarily holds that where the terms of an extradition treaty do not specifically prohibit the forcible abduction of foreign nationals, the treaty does not divest federal courts of

and stated that even if they had, the facts of *Best* were distinguishable. *Id*. at 313.

*Alvarez–Machain* is directly on point here. While it may be shocking that United States Marshals and Dominican authorities removed the defendant without going through the proper channels and even misrepresenting his nationality, it does not afford the defendant relief. The *Toscanino* standard has not been adopted in this Circuit and is likely not even good law. Even if it were, the conduct here, even if believed, is not of the sort laid out it *Toscanino*. No representative of the United States directed the treatment described by the defendant. Even accepting the defendant's fanciful narrative, this was a heavily armed drug dealer who was immediately arrested and transported to a detention facility and then deported shortly thereafter. This is not a situation like *Toscanino* where the defendant was tortured for days and drugged. The defendant's motion should be denied.

   **c.** **THE DEFENDANT'S *FRANKS* MOTION**

    **i.** **Relevant Legal Standard**

To demonstrate entitlement to suppression of evidence under *Franks v. Delaware*, 438 U.S. 154 (1978), a defendant must "demonstrate[] by a preponderance of the evidence that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and that the allegedly false statement is necessary to the finding of probable cause." *United States v. Shields*, 458 F.3d 269, 276 (3d Cir. 2006) (internal quotations and alterations omitted). In addition to demonstrating the inclusion of such a false statement in the affidavit, the defendant must "show both (1) that bad faith or reckless disregard existed on the part of the affiant, and (2) that there would have been no probable cause

---

jurisdiction over the foreign national. *Id*. at 664–66.

but for the incorrect statement." *Id*. (citing *United States v. Frost*, 999 F.2d 737, 743 (3d Cir. 1993)); *see also United States v. Harvey*, 2 F.3d 1318, 1323 (3d Cir. 1993). The right to a *Franks* hearing is not absolute. The defendant must first (1) make a "substantial preliminary showing" that the affiant knowingly or recklessly included a false statement in or omitted facts from the affidavit, and (2) demonstrate that the false statement or omitted facts are "necessary to the finding of probable cause." *United States v. Yusuf*, 461 F.3d 374, 383–84 (3d Cir.2006). HERRERA cannot make such a showing here.

## ii.    Argument As To The Warrant

The contested search was conducted pursuant to a valid search warrant, issued by a neutral and detached magistrate who found probable cause, and upon which the agents and officers relied in good faith. There were no recklessly included false statements in or omitted facts from the affidavit.

### a. Statements Included in the Warrant were factually accurate, and the affiant properly relied on them.

#### i.  The kidnapping section.

To address the defendant's numerous claims, but also keep a coherent narrative of the facts, this section and those that follow will use the statements taken directly from the warrant and demonstrate how they are accurate. The following are verbatim quotes from the kidnapping section of the warrant attached as Attachment A.

"On July 22, 2019, the Federal Bureau of Investigation was alerted of a kidnapping that occurred in Philadelphia, Pennsylvania. As this portion of the investigation commenced, law enforcement learned that on July 20, 2019 the victim was called by a Maxwell Gomez to meet.[6]

---

[6] This is an accurate statement. The Interview of the victim was taken on July 22, 2019. In that

The victim agreed and was picked up in a Buick SUV, later identified as a Buick Enclave.[7]  In

the vehicle was Gomez, Junior (later identified as Junior R. Soriano Felix), Manny and the driver

was Yan,[8] also known as Yanthonic Herrera.[9]  This is the same vehicle described earlier in the

affidavit of probable caused as operated by Herrera and seen at his residence, located at 7131,

Brookview Apartments at Elkins Park, Cheltenham, Montgomery County, Pennsylvania.[10]

While in the vehicle, Soriano Felix asked for the victim's cell phone, which the victim provided.

The phone was an iphone 8 and Soriano Felix did not return the phone to the victim.[11]

     Law Enforcement determined that at approximately 9:45 PM, Herrera's Buick Enclave

arrived at 1808 Afton Street, in Philadelphia. The victim was then escorted into the residence via

the back basement door. One of the males picked up a lawn chair and carried it into the basement

---

interview the victim stated, "I was called by a friend, Max. He wanted to smoke with me. He
picked me up and took me to a house on Afton Street. *See* Attachment B, statement of the victim.
[7] This is an accurate statement. The victim stated, "It's a Buick Gray tinted windows but not the
front window, with purple HDL lights." Additionally, the warrant states "later identified." That
is because independent police investigation identified the vehicle. For example, Attachment C
shows a screenshot from the surveillance camera behind Afton Street, and the vehicle the
defendant was driving when he fled from police. The victim also stated that, "It's been keyed on
the sides, like someone went up and down it and keyed it on the sides." *See* Attachment C.
[8] Not only is it known to investigators that Yanthonic Herrera goes by Yan and is often called
"John" but in an interview with Maxwell Gomez, Gomez confirms that John is Yanthonic
Herrera. *See* minute 6 of Maxwell's video.
[9] The defendant wants to conflate the victim's statements with independent observations made
by law enforcement. The affidavit states the number of occupants and who was driving the
vehicle. That's because that is what happened. *See* Attachment D, various screenshots of the
victim and the above referenced individuals arriving at Afton, information known to the affiant.
Additionally, in the victim's video recorded interview he identifies "John" as driving, "Junior" as
passenger, and that "Manny" and "Maxwell" were in the back. *See* approximately minute 7:20 of
the victim's video interview, provided to the Court and under a protective order to defense
counsel.
[10] Attachment C shows photographs of the vehicle at Afton and the vehicle after the defendant
had fled Elkins Park and Afton.
[11] This information was taken from the victim's statement. *See* Attachment B.

behind the victim.[12]

The victim explained to law enforcement that upon entering the residence, the focus and demeanor of the conversation changed. The individuals, led by Herrera showed the victim a video. Through the context of the conversation, Herrera accused the victim of being on the video and in turn burglarizing the residence. It was clear to the victim that this residence was associated and controlled by Herrera. *See* Attachment B. The victim believes the residence is associated with drug trafficking.[13]

The victim denied being involved and being on the video. The victim was subjected to more questions and then was assaulted by the individuals in the residence. The victim detailed at one point how he was taped to the chair and held against his will. These individuals also stole $200.00 of U.S. Currency from the victim. *See* Attachment B.

As the incident continued, the victim was threatened. The individuals involved threatened to cut off his hands and legs. Soriano Felix produced a handgun, (a Glock handgun), pointed it to the victim's head and demanded answers regarding the burglary and the location of the stolen items. It was clear to the victim that they were threatening to kill him.[14] *See* Attachment B; *see also* the victim's video interview.

The victim further explained how, as the evening progressed, individuals started to leave the residence while the victim was still duct taped to the chair. The victim told law enforcement that he requested to go to the bathroom. He was released from the chair, went to the bathroom

---

[12] *See* Attachment D which is a photograph of the vehicle parked after having just arrived and a male carrying a chair inside the residence. Also note the time on the screenshot.

[13] The victim states this in his video recorded interview. See approximately minute 11 of that video.

[14] Recovered from 1808 Afton Street was a black handgun, 9mm. While the weapon is a Taurus, it is similar in appearance to a Glock handgun.

and upon returning escaped from the residence.[15] *See* Attachment B; *see also* the victim's video interview.

Law Enforcement determined that when Herrera left the residence, he was again driving his Buick Enclave[16] and was believed to be wearing red colored shorts and a dark in color shirt.[17]"

## ii. <u>The recent information section.</u>

As with the kidnapping section, below are verbatim quotes from the warrant and the subsequent support for their validity.

"On the date of July 23, 2019, law enforcement assessed all the information obtained and prepared to safely take these individuals into custody. Numerous surveillance details were deployed on areas deemed important to this investigation. One of those locations was the residence of Herrera located at 7131, Brookview Apartments at Elkins Park, Cheltenham, Montgomery County, Pennsylvania.[18]

On this same date, as the surveillance details were being established, Herrera was observed driving his Buick Enclave in the parking lot of the Brookview apartments in close proximity to his residence. Law Enforcement was not prepared to safely take Herrera into custody. Herrera was at the location for a short period of time and then departed. Mobile

---

[15] See Attachment E, a still frame of a single individual fleeing out of the back of the residence a significant time after the arrival of Herrera and his co-conspirators.

[16] *See* Attachment D.

[17] There are two videos from the front of Afton. These videos are in color and not infrared. The first shows the Buick arrive and an individual (Herrera) exit the driver's seat wearing red shorts and a dark top. Additionally, there is video of Herrera walking near the Buick wearing red shorts and a dark shirt. *See* Attachment F.

[18] The defendant does not contest these facts.

surveillance was attempted, but Herrera was lost in the vicinity of his apartment.[19]

At approximately 5:00 PM, law enforcement again observed Herrera at another location associated with this organization on Lawrence Street in Philadelphia. Herrera was in this residence, exited, entered the Buick Enclave, departed and mobile surveillance was initiated. Law Enforcement then attempted to stop Herrera's Buick, but Herrera refused and fled from law enforcement. Herrera used evasive tactics as he fled and eventually exited the vehicle and ran into a wooded area. As of the writing of this warrant Herrera is not in custody but Gomez, Soriano Felix and another individual associated with the kidnapping are in custody. We believe Herrera not only knows he is wanted by law enforcement but that he is wanted for the kidnapping and assault which occurred on July 20, 2019.[20]

A subsequent search of the Lawrence Street residence yielded packaging material consistent with the distribution of Heroin/Fentanyl. A search of Herrera's Buick Enclave also yielded packaging material. This further substantiates information provided by Confidential Informant Number One.[21]

A search Soriano Felix's residence, the location where the victim was held resulted in the

---

[19] This is a true statement. Officer Cullen observed Herrera leave the property but had no backup and was thus not able to execute an arrest.

[20] All of this activity was documented photographically and/or by reports. The defendant argues that the warrant does not say that this was the defendant's registered address with probation. That fact is more prejudicial to the defendant by its inclusion rather than omission. Stated another way, not only is it an immaterial omission, adding that fact to the warrant would lead to the conclusion that the packaging found there was Herrera's and not the other individual that the defendant alleges it to belong to.

[21] The defendant alleges that this paragraph is misleading or omits facts. The fact that another individual may have had drug packaging in their room is not a material omission. The point of this fact is that the defendant went to a property where packaging was found, and he fled in a vehicle where packaging was found. This is all consistent with the sale of narcotics.

seizure of a Glock handgun.[22]"

### iii.  The remaining allegations

The defendant's remaining allegations are: (1) the police should have done more investigation before issuing the warrant; (2) the vehicle should not have been attributed to Herrera because it was registered to someone else; (3) Detective Carbo did not finish a sentence so there is no good faith exception; (4) another officer, not the affiant, was fired for charges that were later dismissed; (5) a lengthy discussion of the probability of finding what the investigators sought in the warrant; and (6) a discussion about probable cause and the good faith exception.

As to the first allegation, whether the investigators should have done more investigation is irrelevant and not a false statement or material omission. This Court has already found that the warrant contained probable cause. ECF 60-61.

As to the second allegation, the agents attributed the vehicle at issue to the defendant because they saw him driving that vehicle regularly (regardless of the fact that the vehicle was not registered to him). Moreover, Herrera fled from that very vehicle. As such, its registrant does not change a probable cause finding for the search of the defendant's residence.

As to the third allegation, Detective Carbo's unfinished sentence is immaterial to a finding of probable cause or the good faith exception. It amounts to a typographical error and is not a basis for suppression. *See e.g. Massachussetts v. Sheppard*, 468 U.S. 981 (1984)(no suppression of evidence based upon a clerical error made by an issuing authority, reasoning that the purpose of the exclusionary rule is to deter unlawful searches by police, not to punish the errors of magistrates and judges); *United States v. Tracey*, 597 F.3d 140, 153 (3d Cir. 2010)

---

[22] This is well documented by the Philadelphia Police Department and corroborates the victim.

(warrant failed to incorporate narrowing provision of application, however, good faith exception applied as reasonable officer in position of officer executing the warrant would have assumed that warrant incorporated the affidavit); *United States v. Jackson*, 617 F.Supp.2d 316, 321 (M.D. Pa. 2008) (warrant's lack of a signature was a clerical error, as the officer's actions were reasonable the good faith exception insulated the search pursuant to the unsigned warrant.).

As to the fourth allegation, another officer's dismissed charges are not a basis to suppress the warrant or to think that this affiant acted in anything other than good faith.[23]

As to the fifth allegation, this Court has already found that there was, "a fair probability that Apartment 7131 would contain contraband linking it to Defendant's activities, including drugs, drug paraphernalia, proceeds from drugs sales, or evidence from the kidnapping." ECF 60.

Finally, as to the sixth allegation, again the issue of probable cause and good faith has already been decided by this Court. ECF 60-61. The defendant has filed no motion to reconsider, and the government has not agreed to reopen or relitigate that issue.

In sum, there were no misstatements or material omissions in this warrant. The defendant's wild assertions that officers did not actually see the defendant near the Brookview apartments[24], that they lied about his name[25], and his other allegations do not change this. The affiant clearly based the facts in the affidavit on true and accurate information that was thoroughly corroborated. The defendant has not made a "substantial preliminary showing" that the affiant knowingly or recklessly included a false statement in or omitted facts from the affidavit and demonstrate[d] that the false statement or omitted facts are "necessary to the

---

23  Additionally, Officer Meyers has returned to the police force and is currently employed by the Philadelphia Police Department.
24  *See* Defendant Motion to Suppress at 17.
25  *See* Defendant Motion to Suppress at 12.

finding of probable cause." *United States v. Yusuf*, 461 F.3d 374, 383–84 (3d Cir.2006). His

motion should be denied.

## IV.     THE DEFENDANT'S MOTION TO REVEAL THE CONFIDENTIAL INFORMANT IS WITHOUT MERIT AND SHOULD BE DENIED

### a.     Relevant Legal Standard

The defendant has filed a motion requesting disclosure of the identity of the confidential

informant (CI), as well as various information regarding the CI. First, there are two distinct CIs

in this case. One is the CI referenced in the warrant. The other was an informant that told the FBI

about Herrera's location in the Dominican Republic. These two are not the same individual.

Neither of their entities should be revealed under the law of this Circuit.

The motion indicates that the information is sought to prove that the CI is unreliable and

to suppress evidence obtained by a search warrant. *See* Defense Motion to Disclose Confidential

Informant at 5. The motion also states that the identity is essential to the Defendant's defense in

this case, though it is unclear how as the CI is not a witness and the government is not seeking to

introduce information obtained from this witness at trial.

In any event, when the government does not elect to call a CI as a witness at trial, the

issue of disclosure of the information requested by the defendant is governed by *Roviaro v.*

*United States*, 353 U.S. 53 (1957), and subsequent cases applying the decision. In *Roviaro*, the

Supreme Court recognized "the Government's privilege to withhold from disclosure the identity

of persons who furnish information of violations of law to officers charged with enforcement of

that law." *Id*. at 59. The Court recognized the purpose of the privilege as "the furtherance and

protection of the public interest in effective law enforcement." *Id*. At the same time, the Court

acknowledged that "[w]here the disclosure of an informer's identity, or of the contents of his

18

communication, is relevant and helpful to the defense of an accused or is essential to a fair determination of a cause, the privilege must give way." *Id*. at 60-61. Critically, the Court went on to observe:

> Most of the federal cases involving this limitation on the scope of the informer's privilege have arisen where the legality of a *search without a warrant* is in issue and the communications of an informer are claimed to establish probable cause. In these cases the Government has been required to disclose the identity of the informant unless there was sufficient evidence apart from his confidential communication.

*Id*. at 61 (emphasis added).   Ultimately, the Court concluded that the question of whether to require disclosure of an informant's identity "is one that calls for balancing the public interest in protecting the flow of information against the individual's right to prepare his defense." *Id*. at 62.

Interpreting *Roviaro*, the Third Circuit has recognized that a defendant seeking disclosure of an informant's identity "has the burden of establishing the significance of the informant's testimony." *Pickel v. United States*, 746 F.2d 176, 181 (3d Cir. 1984). "Mere speculation as to the usefulness of the informant's testimony to the defendant is insufficient to justify disclosure of his identity." *United States v. Bazzano*, 712 F.2d 826, 839 (3d Cir. 1983) (en banc) (quoting *United States v. Estrella*, 567 F.2d 1151, 1153 (1st Cir. 1977)) (internal alteration omitted).

Here, the defendant is not charged with anything in connection with the information provided by the two confidential informants. The informant that gave information about Herrera's whereabouts in the Dominican Republic is the easier consideration because that informant shared that information only with the FBI. The FBI did not pass that information on to anyone else, did not include it in any affidavits, did not share it with the Dominican Authorities or the Marshals, and obtained no physical evidence from this information. His/her identity is therefore irrelevant and clearly a fishing expedition on the part of the Defendant.

The confidential informant mentioned in the warrant gave de minimis information that

played a role, albeit small, in the probable cause for the warrant. The charges here arise most directly from the results of that duly issued search warrant. The Third Circuit explicitly held in *Bazzano* that an informant's identity was not properly disclosed under *Roviaro*, because "[t]he evidence of [the defendant's] guilt consisted primarily of the physical evidence seized during the search." 712 F.2d at 839. The Court of Appeals went on to explain: "Where an informant's role was in validating a search, disclosure of his identity is not required." *Id.* (*citing McCray v. Illinois*, 386 U.S. 300 (1967)).

This case is squarely controlled by *Bazzano*. Here, just as in *Bazzano*, the evidence of the defendant's guilt of the charged offenses consists primarily of the physical evidence seized during the search of his residence. The CI's identity is therefore irrelevant, and the defendant has not met his burden of demonstrating otherwise. Indeed, *Bazzano* has been repeatedly applied to reject claims for disclosure of the identity of an informer in situations analogous to this one. *See, e.g., United States v. Pitts*, 655 F. App'x 78, 81 (3d Cir. 2016); *United States v. Stanton*, 566 F. App'x 166, 168 (3d Cir. 2015).

The defendant here is essentially attempting to create a backdoor by alleging that the confidential informant is not reliable. First, the defendant's determination of credibility certainly does not control. Even assuming *arguendo* that an informant was arrested for narcotics charges while being an informant, this does not make them *per se* unreliable; it makes them a drug dealer perfectly positioned to inform on other drug dealers, like the defendant. More importantly, the entire issue is moot because even if the confidential informant's information was excised from the warrant there would still be probable cause and the good faith exception would still apply. This Court has already found that the, "[a]ffidavit provided a substantial basis to find probable cause that Defendant Herrera participated in a kidnapping." ECF 60 at 10. Furthermore, this

20

Court has also already found that the good faith exception would apply in this case even if there was no probable cause. ECF 60 at 15. It is worth mentioning that in the defendant's first motion to suppress the warrant, he conceded that of the four narrow circumstances where the good faith does not apply, the first two circumstances did not apply. ECF 60. At 14. Now, after his first motion was denied, he has suddenly alleged that the informant was not reliable and essentially that, "the magistrate judge issued the warrant in reliance on a deliberately or recklessly false affidavit." *United States v. Tracey*, 597 F.3d 140, 151 (3d Cir. 2010) (*quoting United States v. Zimmerman*, 277 F.3d 426, 436–37 (3d Cir. 2002)). This is clearly an attempt to evade and delay justice and obtain disclosure of a confidential informant who has no bearing on the defendant's guilt or innocence. In sum, neither confidential informant will be used at trial; the role the one confidential informant played in the warrant was but a small part of the probable cause determination; and neither informant's identity is essential for a fair trial. As such, the defendant's motion should be denied.

## <u>CONCLUSION</u>

Based on the foregoing, the defendant's motions should be denied in their entirety and without a hearing.

Respectfully submitted,

JACQUELINE C. ROMERO
UNITED STATES ATTORNEY

*/s/ Jason D. Grenell*
JASON D. GRENELL
Assistant United States Attorney

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that today the Government's Response was filed and served on defense

counsel:

Todd Fiore, Esq.
<tfiorelaw@gmail.com>.


*/s/ Jason D. Grenell*
JASON D. GRENELL
Assistant United States Attorney


Dated: September 27, 2024

**ATTACHMENT C**





ATTACHMENT D



First person exits.



Four other individuals exit, including the victim from the back seat. The driver is seen on the far right.



The individual with the beard in the middle, circled, is the driver who investigators believe to be Yanthonic Herrera.



An individual is seen carrying a chair into the property.



Person on the left in shorts is the driver. This is who law enforcement believes to be Herrera. This is a still taken shortly before Herrera departs in the Buick.

ATTACHMENT E



Victim seen leaving the property.

ATTACHMENT F



Individual, identified by law enforcement as Herrera, wearing a dark shirt and red shorts.